# EXHIBIT D

PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

**FILED**
Superior Court of California
County of Los Angeles

**07/29/2024**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ Deputy
        A. Danelian

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

REBEKA RODRIGUEZ,

  Plaintiff,

  v.

FOUNTAIN9, INC., a Delaware corporation, with
its principal place of business in California, d/b/a
WWW.FOUNTAIN9.COM,

  Defendant.

Case No. 24STCV04504

**SECOND AMENDED COMPLAINT FOR
VIOLATION OF CALIFORNIA INVASION
OF PRIVACY ACT ("CIPA")**

Assigned Judge: Hon. Daniel M. Crowley
Dept: 71

Complaint filed: February 22, 2024
Trial date: TBA

Electronically Received 07/29/2024 04:02 PM

## I.    INTRODUCTION

Defendant has secretly deployed spyware at www.fountain9.com/ (the "Website") that accesses visitors' devices and installs tracking spyware prior to any efforts to obtain consent to do so, and then monitors and reports visitors' online habits *after* they leave the Website.

Plaintiff recently visited Defendant's Website.  Without Plaintiff's knowledge or consent, Defendant secretly accessed Plaintiff's device and installed "pen register" and "trap and trace" tracking software in violation of California law.  The harm caused by this intrusion is grave, as summarized by the world's leading cybersecurity firm:

> "*Data is worth money, which is a major reason that your online privacy is under threat.*
>
> *For instance, knowing your browsing habits or search history can deliver big profits to advertisers. If you've been searching for new apartments, your search history could tip an advertiser off to the fact that you're going to be moving home soon — time to start serving you ads for moving services, furniture, DIY stores, and home insurance….*
>
> *The risks are more far-reaching than most people realize because of what might happen to your data next. The development of Big Data means that your browsing history could be analyzed to come up with conclusions that you don't want to be drawn. For example, a woman buying items such as folic acid supplements might not appreciate a marketing agency identifying her as 'pregnant' and targeting her with pregnancy products. [¶]  If she's living with mom and dad or hasn't told her partner, she might not be happy to see 'Congratulations on Your Baby!' marketing materials arrive in the mail….*
>
> *Whenever you visit a website, data is being stored about you — possibly without your consent and even without your knowledge. You likely want to know where that data goes and how it's used, or you could decide you want to avoid it being collected altogether.*"[1]

## II.    JURISDICTION AND VENUE

1.    Defendant is subject to jurisdiction in this state under Penal Code section 502(j), which provides that a person who accesses a computer from another jurisdiction is deemed to have personally

---

[1]    Excerpted from "***What Is Data Privacy?***", found online at https://usa.kaspersky.com/resource-center/threats/internet-and-individual-privacy-protection (last visited Apr. 18, 2024) (emphasis added).

accessed the computer in California.  Plaintiff was in California when Defendant accessed Plaintiff's device and installed tracking code.

2.    Defendant is also subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."  Indeed, Plaintiff is informed and believes and thereon alleges that Defendant generates a minimum of eight percent of revenues from its Website based upon interactions with Californians (including instances in which the Website operates as a "gateway" to sales), such that the website "is the equivalent of a physical store in California."  Since this case involves Defendant's activities in the forum state, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal. App. 5th 1231, 1235 (2020).

3.    Venue is proper in this County pursuant to California Code of Civil Procedure section 394(b).

### III.    PARTIES

4.    Plaintiff is a resident of California.  Plaintiff is also a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law.  As an individual who advances important public interests at the risk of vile personal attacks, Plaintiff should be "praised rather than vilified."  *See Murray v. GMAC Mortgage Corp*., 434 F.3d 948, 954 (7th Cir. 2006).  Indeed, the Ninth Circuit recently made exceptionally clear that it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them. *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

5.    Defendant is a corporation incorporated in the state of Delaware with a principal place of business in California.  Defendant is a provider of inventory software to clients throughout the state of California and this County.

### IV.    FACTUAL ALLEGATIONS

**A.    The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

6.      Since America's founding, privacy has been a legally protected interest at the local, state, and federal levels.  *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

7.      More specifically, privacy protections against the disclosure of personal information are embedded in California statutes and at common law.  *See e.g.*, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("The Ninth Circuit has  repeatedly held that privacy intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their recipients*"); In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (finding "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history" on third party websites), *cert. denied*, 141 S. Ct. 1684 (2021); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed Facebook's facial-recognition technology violated users' privacy rights).

8.      In short, the privacy of personal information is—and has always been—a legally protected interest in many contexts. Thus, a defendant whose acts or practices violate consumer privacy inflicts an actionable "injury" upon an individual.

**B.      The California Invasion of Privacy Act**

9.      The California Legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 *et seq.*, to protect certain privacy rights of California citizens.   The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  (Cal. Penal Code § 630.)

10.      As relevant here, section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

11.    A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

12.    A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

13.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, whereas a "trap and trace device" is a "device or process" that records *incoming* information. A "pen register" and "trap and trace device" are collectively referred to herein as "Pen-Traps" or "PR/TT".

14.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of those surveillance devices consistent with changes in both federal and state law.

15.    For example, with the passage of the 2001 USA PATRIOT Act, the Pen-Trap definition was expanded to include a device or process to keep up with the advancement and evolution of Internet technologies and communications. In 2015, the California Legislature overwhelmingly adopted this updated and expanded definition without a single vote in opposition. *See* Stats. 2015, ch. 204, § 1 (A.B. 929) (eff. Jan. 1, 2016); *see also In re Order Authorizing Prospective & Continuous Release of Cell Site Location Recs.*, 31 F. Supp. 3d 889, 898 n.46 (S.D. Tex. 2014) (citing *Susan Freiwald, Uncertain Privacy: Communication Attributes After the Digital Telephony Act*, 69 S. Cal. L. Rev. 949, 982-89 (1996) (describing the evolution of PR/TT technology from mechanical device to computer system)).

16.    For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address that the email was sent to, and the subject line—because this is the user's *outgoing* information. On the other hand, if the same user receives an email, a "trap and trace

device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

17.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies when such a reading would not conflict with the statutory scheme." *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013); *see also Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."). This accords with the fact that "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

18.     Individuals may bring an action against the violator of any provision of CIPA—including section 638.51 of the Penal Code—for $5,000 per violation. (Cal. Penal Code § 637.2(a)(1).)

19.     CIPA provides for a private right of action and imposes civil liability and statutory penalties for the installation of pen register or trap and trace device without a court order. Cal. Penal Code § 637.2; *see also Greenley*, 684 F. Supp. 3d at 1050-51. In *Greenley*, the federal district court denied a motion to dismiss in a materially identical case, noting the "expansive language in the California Legislature's chosen decision," *id.* at 1050, which the court held was specific as to the type of data a pen register collects – DRAS – but "vague and inclusive as to the form of the collection tool – 'a device or process.'" *Id.* The *Greenley* court concluded that the language suggests that "courts should focus less on the form of the data collector and more on the result." *Id.* Having this legal framework in mind, the court applied the plain meaning to the word "process" and concluded that "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting'" is a process that falls within CIPA's "pen register" definition. *Id.*

**C.    Website Operators Can Deploy Tracking Software to De-Anonymize Otherwise Anonymous Website Visitors and Track and Surveil Such Users.**

20.    Individuals who use devices to connect to an Internet website are typically anonymous and expect to remain anonymous.  Some rogue website operators, however, secretly attach a "tracking beacon" to visitor devices that are then used to track and surveil users.

21.    The tracking software will connect fragments of information – such as a unique IP address, user's operating system name, operating system version number, browser name, browser version number, browser language, screen resolution, geolocation data, email address, mobile ad IDs, embedded social media identities, customer and/or loyalty IDs, cookies[2] and device signature – with connections between them. The tracking software also connects and correlates "undeclared identifiers", such as membership in an email or subscriber list, demographics, purchases/transactions, visits to online news sites, survey results, voter registration, and motor vehicle records.

22.    Using tracking software, a website owner can correlate a grouping of fragments and the connections between them to create a unique digital profile of each individual website visitor.  This process is known as "digital fingerprinting."

23.    If a website owner can link a unique digital profile created by digital fingerprinting to a particular individual, the website owner can assemble a detailed picture of a person's private life, including: the online services for which an individual has registered; personal interests based on websites visited; organizational affiliations; where the individual has been physically; a person's political and religious affiliations; individuals with whom they have leanings and with whom they associate; and where they travel, among other things.    *See*  https://www.priv.gc.ca/en/opc-actions-and-decisions/research/explore-privacy-research/2013/ip_201305/ (last visited Apr. 18, 2024).

24.    Digital fingerprinting of a website's users allows the website owner or its agent to monitor user activity (such as page views, searches, or purchases), de-codes the device used by each website visitor, and enables a website to identify the location, race, age, preferences, internet browsing history, and ethnicity of each user.  This data is captured and processed for the purpose of identifying the source of electronic communications on the website for consumer identification purposes.

25.    The following graphic shows how a website deploying digital fingerprinting spyware has

---

[2] "A 'cookie' is software code that transmits a user's **web-browsing history** and other usage data back to the entity that attached the cookie." *In re Henson*, 869 F.3d 1052, 1056 n.2 (9th Cir. 2017) (emphasis added).

gathered and assimilated the digital fingerprints of a website visitor to create a unique digital identifier

and link it to a previously anonymous individual named Mary Smith, thereby revealing a treasure trove

of private information about Mary Smith's private life:



26.    In the above example, identity resolution has been achieved: using spyware materially

identical to the technology used by the Defendant, the website owner has gathered and assimilated

sufficient digital fingerprints of an anonymous visitor to identify that visitor as Mary Smith, and now

knows the following information about her:

(a)  Full name (*Mary Smith*)

(b)  Date of birth (*May 1, 1979*)

(c)  Gender (*female*)

(d)  Home address (*2345 Avenue C, Papillion Nebraska*)

(e)  Marital Status and Family (*Married with two children*)

(f)  E-mail address (Mary.Smith@gmail.com)

(g)  Personal Cell Phone: (*111) 123-4567*

(h)  Voter Registration Status (*Registered*)

(i)  Interests (*Shopping, Cooking, Traveling, Reading, Science*)

(j)  Employer (*Karen's Fireside, Inc.*)

(k)  Title (*Vice President*)

(l)  Work Hours (*Daily 9-5*)

27.    For the preceding reasons, the ability to link a unique digital profile to a specific individual using digital fingerprinting is of great monetary value.  Indeed, it has created an entire industry known as "identity resolution."  Identity resolution is generally defined as "the ability to recognize an individual person, in real-time, by connecting various identifiers from their digital interactions across devices and touchpoints."  *See* https://www.fullcontact.com/identity-resolution/ (last visited Apr. 18, 2024).

28.    One of the means by which a website owner can gather digital fingerprints as part of its identity resolution efforts is by deploying Pen-Traps spyware on its website.

29.    In lay terms, PR/TT spyware captures electronic impulses that identify the originating source of Internet communication by capturing routing, address, or signaling information.  One means of doing so is to secretly deploy tracking spyware on a website.

30.    Indeed, PR/TT spyware has caught the attention of the United States Director of National Intelligence, who recently explained that "the advancement of digital technology, including location-tracking and other features of smartphones and other electronic devices, and the advertising-based monetization models that underlie many commercial offerings available on the Internet" pose a threat to the individuals and "raises significant issues related to privacy and civil liberties."

**D.    The PR/TT Spyware Is a "Pen Register".**

31.    To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  *See* Figure 1.

**Figure 1:**

/ / /

/ / /

/ / /

/ / /



32.     The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should display.

33.     In addition, the server's instruction cause at least one PR/TT beacon to be installed on a Website user's Internet browser.  The PR/TT beacon then causes the browser to send identifying information—including the user's IP address—to the PR/TT beacon's software provider, which is a software-as-a-service company that develops the PR/TT beacon provided to website owners like Defendant for a fee.  The PR/TT beacon's software provider uses such PR/TT beacon to receive, store, and analyze data collected from website visitors, including visitors of Defendant's Website.  The PR/TT beacon's software provider provides analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the PR/TT beacon.

34.     The IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The first two sets of numbers indicate what network the device is on (*e.g.*, 192.168), and the second two sets of numbers identify the specific device (*e.g.*, 123.132).

35.     Thus, the IP address enables a device to communicate with another device—such as a computer's browser communicating with a server—and the IP address contains the device's geographical location.

36.     Through an IP address, the device's state, city, and zip code can be determined.

37.     As alleged below, Defendant installs the PR/TT beacon on the user's browser, and such PR/TT beacon collects information—users' IP addresses—that identifies the outgoing "routing,

addressing, or signaling information" of the user.  Accordingly, Defendant's PR/TT beacon is a "pen register."

38.    The first time a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response.  This response also includes directions to install the PR/TT beacon on the user's browser.  The PR/TT beacon, in turn, instructs the user's browser to send the user's IP address to the PR/TT beacon's developer.

39.    Moreover, the PR/TT beacon's developer stores a beacon or cookie with the user's IP address in the user's browser cache.  When the user subsequently visits Defendant's Website, the PR/TT beacon instructs the user's browser to send the user's IP address through the beacon or cookie.

40.    If the user clears his or her cookies, then the user wipes out the PR/TT beacon from the user's browser cache.  Accordingly, the next time the user visits Defendant's Website, the process begins over again:  (i) Defendant's server installs the PR/TT beacon on the user's browser, (ii) the PR/TT beacon instructs the browser to send to the PR/TT developer the user's IP address, (iii) the PR/TT beacon stores a beacon or cookie in the browser cache, and (iv) the PR/TT beacon's developer will continue to receive the user's IP address on subsequent visits to the Website through the cookie or beacon.

41.    In all cases, the PR/TT beacon receives a user's IP address each and every time a user interacts with the website of one of the PR/TT beacon's developer's clients, including Defendant's Website.

42.    The user's IP address is transmitted to the PR/TT beacon along with the cookie value.

43.    The PR/TT beacon is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

44.    Further, the PR/TT beacon is a "device" because "in order for software to work, it must be run on some kind of computing device.  It is artificial to claim that software must be viewed in isolation from the computing device on which it runs and with which it is inseparable in regard to the challenged conduct." *James v. Walt Disney Co.*, - F. Supp. 3d -, No. 23-cv-02500-EMC (EMC), 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

45.    Because the PR/TT beacon captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of section 638.50(b) of the California Penal Code.

**E.    Defendant Secretly Installed Tracking Software on Plaintiff's and Other Users' Browsers Without Prior Consent or a Court Order in Violation of California Law.**

46.    Defendant owns and operates the Website.

47.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[3]

48.    Oftentimes, third-party scripts are installed on websites "for advertising purposes." *Id.*

49.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete user profile over time." *Id.*

50.    Defendant has incorporated the code of the PR/TT beacon into the code of its Website. Thus, when Plaintiff visited the Website, the Website caused the PR/TT beacon to be installed on Plaintiff's and other users' browsers.

51.    As outlined above, when a user visits the Website, the Website's code—as programmed by Defendant—installs the PR/TT onto the user's browser.

52.    Upon installing the PR/TT on its Website, Defendant uses the PR/TT to collect the IP address of visitors to the Website, which is used by the PR/TT beacon's developer to provide services to Defendant and its other clients, including targeted advertisements and website analytics. Defendant and its partners use the PR/TT beacon to "digitally fingerprint" each visitor.

53.    At no time prior to the installation and use of the PR/TT beacon on Plaintiff's and other users' browsers, or prior to the use of the PR/TT beacon, did Defendant procure Plaintiff's or other users' consent for such conduct. Nor did Defendant obtain a court order to install or use the PR/TT

---

[3] "Third-party tracking refers to the practice in which a tracker on a website is set by a different website than the one the visitor is currently on. Third-party trackers are snippets of code that are typically installed on multiple websites. They collect and send information about a user's browsing history to other companies, often for advertising purposes. If the same third-party tracker is present on many sites, it can build a more complete user profile over time." https://piwik.pro/glossary/third-party-tracking/ (last visited Apr. 18, 2024). "[C]ompanies may be in trouble using third-party cookies on their websites without complying with privacy laws in a specific jurisdiction…." *Id.*

beacon. The PR/TT beacon deploys prior to any efforts to notify visitors or obtain their consent to being tracked.

54. The specific PR/TT spyware beacons detected on Defendant's Website are identified below, which explains the details of the beacons' deployment and the breadth of the beacons' operation. Plaintiff's investigation of the Website has determined that at least 15 types of PR/TT spyware are deployed by the Website, *i.e.*: (1) ShareThis.com; (2) Nexxen; (3) Neustar; (4) OnAudience; (5) Pippio; (6) TapAd; (7) Dun & Bradstreet – d41.co; (8) Lotame – crwdcntrl.com; (9) Eyeota; (10) Adobe / Demdex; (11) Live Intent; (12) The Trade Desk; (13) Bombora – ml314.com; (14) SiteScout.com; and (15) Live Ramp / RapLeaf.

**1.    Data Harvesting Without Consent**

55. When a user visits the Website, distinct third-party tracking services are detected. These entities, recognized as prominent digital trackers, employ sophisticated methodologies to profile users. These methodologies encompass the acquisition of device IP addresses, synchronizing external identifiers, utilizing TCP/IP header-derived IP addresses, and extracting user agent and device particulars. Additionally, they engage in cookie-sharing practices during request transmissions on the Website.

56. Plaintiff's investigation of the Website via a computer expert has determined that visitor data is harvested and shared with third-party services immediately upon webpage loading, preceding any opportunity for visitors to consent to or decline the Website's privacy policy or cookie banner.

**2.    ShareThis.com**

57. ShareThis ***digitally fingerprints visitor devices***, ***collects data on user behavior***, and provides this to advertisers and technology companies for ad targeting, analytics, and customer acquisition purposes.

58. The image below shows that the Website stores a ***third party tracking cookie*** for sharethis.com. The cookie "__stid" is used to store a unique user id for visitor data stored on the sharethis.com platform.



59.    The Website has code that creates an iframe connection to sharethis.com that allows normal security measures to be bypassed for sharing visitor data.  The unique user ID is shared with multiple third parties so that they access the visitor data collected and synchronize all information with their platform.

60.    This process identifies visitors and aggregates all data that matches their digital fingerprint.  Any existing data that matches this digital fingerprint is unified to a single user profile.  This data is not limited by time or site.  Behavioral tracking records can span years of activity across the entire web.  This level of information allows websites to create complex profiles of users that can be used for targeted and predictive advertising.

**3.    Nexxen**

61.    The Nexxen platform is used for businesses to identify and segment ***digitally fingerprinted*** visitors for marketing campaigns.  Companies can use the Nexxen platform to buy or sell this audience data.

1
2
3
4
5
6
7
8
9



10    62.    A request is sent to the Nexxen tracking URL at: adnxs.com. The X-Proxy-Origin in the

11    response header returned by Nexxen contains the visitor's IP address. In addition to IP tracing, the

12    Website enables the use of ***third-party tracking cookies*** to be stored on the visitor's browser and sent

13    with the request.

14
15    
16

17
18
19    
20
21
22

23    **4.    Neustar**

24    63.    Neustar describes its services in relevant part as follows: "Neustar's Customer

25    Experience services connect data and media across channels (online, offline, television, etc.) to enable

26    marketers to analyze visitor behavior to create segmented audiences for targeted marketing campaigns."

27    64.    Visitor devices are ***digitally fingerprinted***, and devices identified as being associated

28    with users are ***tracked*** and unified into a single behavioral profile. Tracking is not limited to digital

SECOND AMENDED COMPLAINT

interaction; ***physical and offline activities are tracked*** and used to further build a predictive profile for visitors.

**Visitor Identification (below)**



**Household/Cross-Device Tracking**

65.    The request below was sent to Neustar's servers and contains the visitor's IP address in the data payload.  ***Tracking cookies are stored on the browser and sent with the request to identify website visitors easily and with increased accuracy***.

**5.    OnAudience**

66.    OnAudience is a data enrichment service that helps marketers to identify website visitors and add them to customer audiences for targeted advertising and marketing campaigns.



67.    The request sent to the onaudience.com tracking pixel contains the user ID that is used to map the user's data and store the ***digital fingerprint*** of the user's device.





68.    ***Tracking cookies*** are stored on the browser to more easily ID visitors in the future.



**6.    Pippio**

69.    Pippio is a service that sells people-based data that connects and identifies visitor devices to real people.  By using this service, websites can "enrich" their data for better insights, but the data that websites collect is used by the Pippio platform ***to enrich the data of their other customers***.

70.    The request to pippio.com contains visitor identification values, which are used to synchronize user data across multiple platforms.  ***Tracking cookies*** are stored on the device and sent with the request for easier visitor identification with future requests.





**7.    TapAd**

71.    TapAd is an identity resolution service for building audiences for targeted marketing and advertising campaigns, which is used on the Website.





### 8.    Dun & Bradstreet – d41.co

72.    Dun & Bradstreet states: "Visitor Intelligence provides information on website traffic of businesses and business employees to a company website owner for marketing purposes using a combination of IP address-based lookups and cookie syncing."



73.     A request is sent to Dun & Bradstreet containing the partner platform user ID to identify visitors and synchronize harvested data. ***Tracking cookies*** are stored on the browser for easier visitor identification in the future.





### 9.     Lotame – crwdcntrl.com

74.     Lotame is a data management platform whose software is used for collecting and managing data. It allows businesses to identify audience segments, which can be used to target specific users and contexts in online advertising campaigns. In other words, it is used for visitor identification.

75.     The request was sent with ***tracking cookies*** stored on the web browser.



### 10.    Eyeota

76.     Eyeota is an identity resolution service for building audiences for targeted marketing and advertising campaigns for business-to-business and business-to-consumer businesses. Requests are sent to Eyeota for the purpose of matching ***digitally fingerprinted*** devices with existing visitor data, which is accessed using unique user identification values. ***Tracking cookies*** are stored on the browser for easier visitor identification in the future.



### 11.    Adobe / Demdex

77.    DemDex manages advertising audiences by capturing ***visitor behavioral data*** on behalf of websites and advertisers and storing it in a "behavioral data bank".  This data is used for cross-channel marketing campaigns that deliver "video, display, and search advertising across any screen in any format.

78.    A request is sent to demdex.net containing the partner platform user ID to ***identify visitors*** and synchronize harvested data.  ***Tracking cookies*** are stored on the browser for easier visitor identification in the future.



### 12. Live Intent

79.    Live Intent is an email marketing automation tool that ***identifies website visitors and uses behavioral tracking*** to create marketing audiences for their customers' targeted email marketing campaigns.

80.    Live Intent engages in data harvesting, visitor identification, user tracking, and monetizing user data.

81.    A request is sent to Live Intent to synchronize previously existing visitor data with the new data from the identified visitor. ***Tracking cookies*** are stored on the browser for easier visitor identification in the future.

SECOND AMENDED COMPLAINT

1



2

3

4

5

6

7

8      ### 13.    The Trade Desk

9          82.    The Trade Desk, Inc. is an American multinational technology company that specializes

10   in real-time programmatic marketing automation technologies, products, and services that are designed

11   to personalize digital content delivery to users.

12



13

14

15

16

17

18

19

20          83.    A request is sent to The Trade Desk to synchronize data with the platform TapAd.

21   ***Tracking cookies*** are stored on the browser for easier visitor identification.

22



23

24

25

26

27

28



### 14.    Bombora – ml314.com

84.    Bombora is a service that provides visitor/company "intent data" for business-to-business sales and marketing teams.

85.    Bombora is a business-to-business visitor identification platform that will reveal the companies that website visitors work for.  When behavioral tracking indicates that a visitor is almost ready to buy, Bombora will inform its clients that they have a new lead.



86.    A request is sent to Bombora's servers containing values *used to track and reveal visitor identities*.  *Tracking cookies* are stored on the browser.





**15.  SiteScout.com**

87.  SiteScout.com is an advertising service that utilizes ***data collection, behavioral analysis, and user retargeting***.

88.  A request is sent to sitescout.com to synchronize ***visitor data*** with the sharethis.com platform. ***Tracking cookies*** are stored on the browser.





**16.  LiveRamp / RapLeaf**

89.  LiveRamp is a data onboarding platform that gathers a company's ***online and offline customer data***, ***maps the data to individual customer profiles***, and uploads enriched audience segments to advertising platforms.

**Retrieving RampIDs**

Identity resolution is the process of resolving your data to a specific individual. The process matches personal identifiers (such as a name, address, phone, and email) to digital identifiers (such as an IP address, cookie, or location), across multiple devices and channels. The RampID Retrieval API uses sophisticated machine learning algorithms and a patented process to then map that personal and digital information to a unique identifier in the LiveRamp Identity Graph. This unique identifier is called a RampID.

The Retrieval API provides two primary endpoints for perform known-to-pseudonymous identity resolution:

- The Match Endpoint is used for plaintext PII. This endpoint attempts to match the individual components of the input data to various combinations of RampID data and can return multiple RampIDs per request.
- The Lookup Endpoint is used when you don't want to send plaintext PII. This endpoint performs a direct lookup against a single input string (it does not attempt to match alternate combinations of data) and returns only one RampID per request.

SECOND AMENDED COMPLAINT

**F.    Defendant's Conduct Constitutes an Invasion of Plaintiff's Privacy.**

90.    The collection of Plaintiff's personally identifying, non-anonymized information through Defendant's installation and use of the PR/TT beacon and tracking cookies constitutes an invasion of privacy.

91.    As alleged herein, the PR/TT beacon and related tracking cookies are designed to analyze Website data and marketing campaigns, conduct targeted advertising, and boost Defendant's revenue, all through their surreptitious collection of user data including Plaintiff's data.

92.    Companies such as Defendant share their users' data with the PR/TT beacon's developer. In order for such developer to perform data analysis on user data and to assist companies like Defendant to run targeted advertising campaigns, the PR/TT beacon's developer needs to collect data that identifies a particular user.  This is why the PR/TT beacon's developer collects IP addresses:  it allows the developer to segment users in order to run targeted campaigns and perform data analysis.

93.    In other words, companies like Defendant are collecting users' data and sending it to its PR/TT beacon's developer for a profit including by optimizing its marketing campaigns.

**G.    Plaintiff's Experience**

94.    Plaintiff has visited the Website within the applicable statute of limitations period via an Internet-connected computer.  In particular, Plaintiff's visit occurred in January 2024.

95.    When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the PR/TT beacon and tracking cookies to be installed on Plaintiff's browser.  Defendant and the PR/TT beacon's developer then used the PR/TT beacon to collect Plaintiff's IP address.

96.    Defendant and the PR/TT beacon's developer used the information collected by the PR/TT beacon and tracking cookies to analyze Website data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's and/or advertisers' revenue.

97.    Plaintiff did not provide Plaintiff's prior consent to Defendant to install or use the PR/TT beacon or tracking cookies on Plaintiff's browser.

98.    Defendant did not obtain a court order before installing or using the PR/TT beacon.

99.    Plaintiff has, therefore, had Plaintiff's privacy invaded by Defendant's violations of section 638.51(a) of the California Penal Code.

100.    As explained above, Defendant knowingly and intentionally deployed PR/TT spyware to (1) decode and record the routing, addressing, and signaling information transmitted by Plaintiff's electronic device communication; and (2) capture the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication as part of its identity resolution efforts. This conduct constitutes illegal installation of PR/TT spyware in violation of California law.

101.    Defendant did not obtain Plaintiff's knowing and informed consent to the preceding acts, nor did Defendant obtain a court order authorizing it to do so.

102.    Plaintiff suffered an injury to her dignity caused by the invasion of her privacy attributable to Defendant's wrongdoing and the wrongdoing of the aforementioned third parties. Plaintiff suffered the loss of her anonymity in visiting and using Defendant's Website and her right to control information concerning herself due to Defendant's and the actions of third parties who are partners of Defendant in the wrongdoing alleged herein.  As a result of their actions, Plaintiff and her device were digitally fingerprinted and had tracking cookies installed on her browser that tracked her behavior while visiting the Website such as pages viewed and offline.  Such tracking cookies transmitted Plaintiff's **web-browsing history** and other usage data back to the entities that attached the cookies.  The "disclosure of private information" is an intangible harm that is "traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC. v. Ramirez*, 594 U.S. 413, 425 (2021). This is consistent with longstanding Ninth Circuit precedent recognizing that historical privacy rights " 'encompass[] the individual's control of information concerning his or her person' ... the violation of which gives rise to a concrete injury sufficient to confer standing." *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021) (quoting *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017)).

**H.      Defendant Is a Principal Under Section 31 of the Penal Code.**

103.    Section 31 of the Penal Code provides in relevant part:  "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed."

104.    Under section 31 of the Penal Code, Defendant is a principal of the violation of section 638.51 of the Penal Code by directly committed the act constituting the offense, which is a violation of section 638.51 of the Penal Code.  Alternatively, Defendant is a principal of such offense because it "aid[ed] and "abet[ted] in its commission.  Defendant aided in its commission by agreeing to allow the PR/TT Spyware makers' software to operate on its Website and, in fact, allowing such third-party software to operate on such Website.  Such acts were essential to the commission of the violation of section 638.51.

105.    Defendant knew that the PR/TT Spyware makers would collect personal information when Defendant installed or allowed the installation of the relevant code on its Website.  Defendant also knew that it would receive discounted or higher-quality analytics and other services derived from the data about consumers' online activities, including the option to target advertisements to customers that had merely browsed the Website.

106.    The PR/TT Spyware makers' software in the Website is designed for the purpose of de-anonymizing and tracking visitors of the Website.  The software design is not a mistake.  *See Gladstone v. Amazon Web Servs., Inc.*, 2024 WL 3276490, at *11 (W.D. Wash. July 2, 2024) ("The SAC alleges that Amazon Connect is designed for the purpose of recording and analyzing communications between its customers (like Capital One) and consumers or other entities.").  Defendant knew this before agreeing to install and allow such third party spyware software to exist and operate on its Website.  "'[I]ntent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he [or she] knows are substantially certain to result from his [or her] conduct.'"  *King v. U.S. Bank National Ass'n*, 53 Cal. App. 5th 675, 712 (2020), *rev. denied,* No. S264308 (Cal. Nov. 10, 2020) (quoting *Schroder v. Auto Driveway Co.*, 11 Cal. 3d 908, 922 (1974))

107.    At minimum, Defendant's conduct may be considered intentional because it has been made aware of its wrongdoing via the commencement of this action many months ago, but has taken no remedial action to eliminate the wrongdoing.  *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (citing *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 684 (N.D. Cal. 2021) ("At the pleading stage, … interception may be considered intentional 'where a defendant is aware of the defect causing the interception but takes no remedial action.'") (quoting *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020))).

## V.    CAUSE OF ACTION

### CALIFORNIA INVASION OF PRIVACY ACT

### PENAL CODE SECTION 638.51(a)

108.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

109.    Plaintiff brings this cause of action individually against Defendant.

110.    Section 638.51 of the Penal Code provides that it is illegal for any "person' to "install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53."  (Cal. Penal Code § 638.51(a).)

111.    A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  (Cal. Penal Code § 638.50(b).)

112.    The PR/TT beacon is a "pen register" because it is a "device or process" that "capture[d]" the "routing, addressing, or signaling information"—the IP address—from the electronic communications transmitted by Plaintiff's computer or smartphone.  (Cal. Penal Code § 638.50(b).)

113.    At all relevant times, Defendant knowingly installed the PR/TT beacon—which is a pen register—on Plaintiff's browser, and used the PR/TT beacon to collect Plaintiff's IP address, and track Plaintiff.

114.    The PR/TT beacon does not collect the content of Plaintiff's electronic communications with the Website.  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses

'constitute addressing information and do not necessarily reveal any more about the underlying contents of communication than do phone numbers.'") (quotation omitted).

115.    Plaintiff did not provide Plaintiff's prior consent to Defendant's installation or use of the PR/TT beacon.

116.    Defendant did not obtain a court order to install or use the PR/TT beacon.

117.    Pursuant to section 637.2 of the California Penal Code, Plaintiff has been injured by Defendant's violation of section 638.51(a) of the California Penal Code, and seeks statutory damages of $5,000 for Defendant's violation of section 638.51(a).  *See* Penal Code § 637.2(a)(1).

118.    By knowingly violating a criminal statute and accessing Plaintiff's browser to install tracking software without Plaintiff's prior consent, Defendant acted with oppression and malice.  As such, Defendant is liable for punitive damages pursuant to Civil Code section 3294.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a.    For statutory damages, punitive damages, reasonable attorneys' fees pursuant to Cal. Civ. Proc. Code § 1021.5, and costs of suit; and

b.    For any and all other relief at law that may be appropriate.

Dated:  July 29, 2024                         PACIFIC TRIAL ATTORNEYS, APC

By:_____
Scott. J. Ferrell
Attorneys for Plaintiff

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 4100 Newport Place Drive, Suite 800, Newport Beach, CA 92660.

On July 29, 2024, I served the foregoing document described as **SECOND AMENDED COMPLAINT FOR VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")** on the following person(s) in the manner indicated:

**SEE ATTACHED SERVICE LIST**

☐　　(BY MAIL)　I am familiar with the practice of Pacific Trial Attorneys for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope, with postage fully prepaid, addressed as set forth herein, and such envelope was placed for collection and mailing at Pacific Trial Attorneys, Newport Beach, California, following ordinary business practices.

☐　　(BY FEDERAL EXPRESS OVERNIGHT)　I am familiar with the practice of Pacific Trial Attorneys for collection and processing of correspondence for delivery by overnight courier. Correspondence so collected and processed is deposited in a box or other facility regularly maintained by Federal Express that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope designated by Federal Express with delivery fees paid or provided for, addressed as set forth herein, and such envelope was placed for delivery by Federal Express at Pacific Trial Attorneys, Newport Beach, California, following ordinary business practices.

☐　　(BY HAND DELIVERY)　I am familiar with the practice of Pacific Trial Attorneys for collection and processing of correspondence for hand delivery by courier. I caused such document to be delivered by hand to the addressee(s) designated.

☒　　(BY ELECTRONIC SERVICE) I am causing the document(s) to be served by email or electronic transmission via USA Legal sent on the date shown below to the email addresses of the persons listed in the attached service list.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on July 29, 2024, at Newport Beach, California.

_____
Mandy K. Jung

SECOND AMENDED COMPLAINT

1

**SERVICE LIST**

2

Carver Clark Farrow II, Esq.                    Attorneys for Defendant
3                                               FOUNTAIN9, INC.
809 Cuesta Drive, Suite B, PMB 5021
Mountain View, CA 94040
4       Email: carver@farrowlawfirm.esq

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT